and the Consolidated Cases. Mr. Clement. Mr. Chief Justice, and may it please the Court, this case involves a massive government bait-and-switch and the fundamental question of whether the government has to keep its word after its money-mandating promises have induced reliance. The government suggests that there is no such thing as an enforceable congressional promise. And that even the clearest command to pay money is subject to a caveat that it's subject to appropriations, and reliance, even on clear language, is, quote, inherently unreasonable. That position is inconsistent with all this Court's cases, including the ones that go the government's way by finding an implied repeal. For in the government's view, there was nothing to repeal. Simply failing to appropriate the money cancels the obligation. The government's position would also make it impossible to accomplish many important government objectives that require a clear and enforceable promise to pay, as this case well illustrates. When Congress made the health benefit exchanges a centerpiece of the Affordable Care Act, it faced a problem. The exchanges depended on the participant of private health insurance companies, and those companies were being asked to insure previously uninsured people on unprecedented terms. The natural reaction of the insurers would have been to charge a substantial premium to account for the uncertainties. But that premium would have worked against the government in two fundamental ways. First, it would have made the policies relatively unaffordable, contrary to the whole purpose of the Affordable Care Act. And second, the government would have ended up paying for those heightened premiums through tax subsidies. So the risk corridor programs at issue here was an important component of the government's solution to the problem. The program depended on a clear and enforceable promise that the government would pay for a portion of any losses incurred by the health insurance companies that stepped forward. In order for that promise to work, it had to be clear and enforceable. If the government had simply said, we will make these risk corridor payments subject to appropriations, the promise would have made no difference whatsoever. If all the insurance companies were doing was trading the uncertainties about the risk pool for the uncertainties over the funding priorities of future Congresses, they would have gained nothing in the process. So Congress made a clear money-mandating promise to pay. Based on that promise, my clients and others got state-approved rates to offer policies on the exchanges. After those rates were already set, then HHS adopted its so-called transitional policy, which kept some healthy people off the exchanges and, as the government itself recognized, meant that more insurers would lose more money. But HHS said to the insurers, don't worry, we have the risk corridors program in place and we will cover some of those excess losses as a result of the transitional policy. So the policies went forward and losses were incurred. And when it became time to pay, the government then started pointing to some ambiguous appropriations riders. But those riders, by their plain terms, did not repeal the obligations of 1342 or even say prospectively that we're going to limit the payments out to the extent of payments in. What if they had been included in the original legislation, if the appropriations riders had been included in the original legislation? Would that make a difference? Well, ultimately, I don't think it would make a difference in the sense that I think it's a little hard to figure out exactly what that would look like. And I think the reason you didn't have appropriation riders in the 2010 legislation is because for this part of the policy, the policies wouldn't be offered until 2014 and you really wouldn't be in a position to know whether or not there was an obligation until 2015. What if the law said the government shall pay and the money shall come from the premiums, but it may not come from the only other identified source that could be used to pay? So, Justice Alito, I think if they tried to do that ex ante in 2014, that I think people would say that would be sufficiently strange that I think people would say, well, what exactly do you mean by that? And I think there probably would have been a clarification before anybody relied. But, of course, back in 2010, there was none of that kind of language whatsoever and you had what I think anybody would recognize as a clear money-mandating promise that the government shall pay certain obligations. Mr. Clement, you are relying on what you call an implied damages action based on 1342. But this Court has been reluctant to imply any right of action has insisted on Congress providing the right of action. And here the right of action, your complaint, is not based on any right of action provided by Congress. Well, ultimately we think it is, Justice Ginsburg, but it has to be inferred from the money-mandating promise itself. And I think it's telling that there was nobody on this Court who is a greater skeptic of implied cause of actions than Justice Scalia. But in his opinion in Bowen v. Massachusetts, he recognized that it had been long established that this kind of shall-pay language gave rise not just to jurisdiction under the Tucker Act, but to a cause of action for damages. I think the reason that even Justice Scalia, no fan of the implied cause of action, was able to recognize that is because if you think about the kind of obligations that are at issue in the jurisdiction under the Tucker Act, they are all clear obligations to pay. And whether it's the takings clause, whether it's a contract, whether it's a money-mandating statute, in each case there's a clear obligation to pay specific amounts to specific people. And in that situation, I don't think that you need to have a separate cause of action. I mean, you think about a contract. You generally don't have in the contract a cause of action to bring a breach of contract action. It's implicit that if the government or any other counterparty doesn't uphold their end of the bargain, there is a cause of action for damages. Alito, what is the difference between a statutory provision that says a person shall have some nonmonetary right and a statutory provision that says an entity, a company, shall be paid? Why should we be more willing to infer a cause of action in the latter situation than in the former? Is there a special solicitude for insurance companies? Well, no, obviously not, Justice Alito. But I think, first of all, if you have the sort of shall do something other than pay money, you don't have to look for an implied cause of action, because I think you would have a cause of action that would arise under the APA to enforce the particular whatever it was, shall fill in the blank, the action you can enforce under the APA. If the action is ‑‑ No, no, a damages remedy for that. Well, I don't know that you would necessarily infer a damages remedy for that, but I think you would get very much the same thing under the APA. And I think, you know, as the majority held in Bowen against Massachusetts, sometimes you can get relief under the APA that's not strictly limited to injunctive relief, but includes other kinds of monetary relief, but not damages. In all events, we're not asking you to break any new ground here. And I think compared to cases of this Court, like White Mountain Apache and the Mitchell case from 1983, sometimes called Mitchell II, this case is a very different case, because the application under the statute is enforceable in the court of claims under the Tucker Act. Are there any limits to that, Mr. Clement? Is the shall pay language sufficient in all cases, no matter what the kind of program or entitlement or grant? Is it just shall pay, does it? Well, I think, Justice Kagan, if you look at the Federal Circuit's precedence on this, shall pay alone might not do it, but when you combine that with specificity about what amounts are going to be paid and to whom and under what circumstances, that's clearly sufficient for a money-mandating promise, and it always has been. And again, I think if you think about this case in comparison to this Court's precedence involving Indian trust obligations, this is a much more specific and much more enforceable promise. This is not a direction to the Secretary of Interior to take certain property and trust. This is a direction that you shall pay certain amounts. And I think one thing that makes this a very easy case, if you're concerned about sort of opening up the sort of money-mandating statute too wide, is that you have the exact same language here in the parallel provision, shall pay, and nobody thinks, not even the government thinks, that the shall pay direction to those insurance companies that made profits on the exchanges is anything but an enforceable promise. Roberts. You make a case at some length about the reliance of the insurance companies. They were basically seduced into this program. But they have good lawyers, and the Constitution says no money shall come out of the Treasury except pursuant to an appropriations clause. And I would have thought at some point they would have sat down and said, well, why don't we insist upon an appropriations provision before we put ourselves on the hook for $12 billion? Well, Mr. Chief Justice, I think they did have very good lawyers, and they looked at this Court's precedents. They looked at the precedents of the Federal Circuit. And although those Court's cases all stand for the proposition that obviously Congress has the power of the purse, with all respect, they don't stand for the proposition that the only way that Congress can open the purse is by making a specific appropriation. It has long been the law recognized by this Court and by the government in its GAO Red Book, which is sort of the Bible for these kind of things, that the government can obligate itself and Congress can obligate itself without using any magic words of appropriation. And the governing standard is if a statute is money mandating, then that obligates the government. And the reason that's not a problem under the Anti-Deficiency Act or the Appropriations Clause is that's Congress itself opening up the purse for specific amounts, for specific purposes. Yeah, I know. But I think the reliance argument has to be taken at least subject to the qualification. Yeah, I understand your argument. But if somebody raised their hand and said, hey, shouldn't we get an appropriations provision here, nobody would have said, well, you know, we don't need it because this is a money mandating statute and this and this and this, and, you know, if something goes wrong, we can get Mr. Clement to go argue the case. It strikes me that you do have the Appropriations Clause sitting out there, and it's a pretty clear yellow light. Well, Mr. Chief Justice, I don't think it's as clear as you think. Because, look, the government's position is what we needed to do was include language in 2010 that said that this constitutes budget authority. But, of course, that would be subject to a subsequent Congress's amendment as well. So for purposes of the retroactivity argument, I think what's important here is in 2010 they made a money mandating promise that I think anyone who looked at all the sources would say that's good enough. Now, could it be better? Could it have belt and suspender? Sure. But it's good enough. And then they relied on that. They provided the service. The government had no problem saying, based on the same shall pay language in 1342, we need you insurance companies that made money in 2014 to make your payments in. And at that point, in 2000, late 2014, after the insurance companies had upheld their end of the bargain, they simply imposed some appropriations riders that said we're not going to use, by their terms, we're not going to use this one fund to make these payments. And they didn't use language that this Court has looked to in other cases, like from this fund or any other or this act or any other. They didn't do what they could have done, which is they could have prospectively repealed 1342 or they could have prospectively limited the amount of payments out to payments in. Was there some other fund that could have been used? I don't think that anybody readily identified another fund that would have been used by the Secretary of Health and Human Services to make the payments. But it's black letter law that that doesn't make the obligation go away. But wasn't this the only fund that was identified by the GAO as a potential source? Well, the GAO, in its correspondence with two members of Congress, identified two sources of funds for the appropriations. These funds were one of them, and then the other one was that the payments in could be construed as user fees. Interestingly, GAO said what were the user fees? What were they paying for? They were paying for the guarantee that the government would pay for their losses. So even GAO's analysis of why it was that the payments in could be construed as user fees depends on the notion that these were real enforceable promises. But you've now had an opportunity to study this in detail. Can you identify any source other than the judgment fund that could be used to pay these billions of dollars? I can't, Justice Alito, and that's a problem for why the Secretary of Health and the Secretary of State are not able to make the payments without violating the Antideficiency Act. But what happens in that situation, and this Court made this absolutely clear in the Rama decision, is when there are insufficient funds for an executive branch officer to make a payment under which the United States is obligated, then they can't make the payment voluntarily. They can't cut the check.  The fact that the government can't cut the check to pay its obligation means there's either a breach of contract or a violation of the statute, then there's a judgment, and then you can collect under the judgment fund. But the fact that the government decides that, you know, we have these obligations but we just don't feel like appropriating enough money for them just doesn't cancel the obligation or make it go away. And as I said, that's really been black-letter law for a hundred years in the Court of Claims. But do you think it would be reasonable for the insurance companies to say, look, we know that Congress is now refusing to appropriate any money to pay us, but don't worry, we'll sue later and we'll get the money, billions of dollars, from the judgment fund? Justice Alito, at the time that they're first being told that the government's not going to pay in 2014, late 2014, it's already too late for 2014. They've already performed. And so as to that, there's a real retroactivity problem. Now, I think if Congress at that point had said, as they did in other proposed legislation that didn't have the votes, if they had said prospectively, we're no longer going to make payments under 1342 or we're going to limit the amount of payments out to payments in, at that point, absolutely, an insurance company would prudently change its course of conduct. But if an insurance company is watching Congress and what it sees is there are express efforts to repeal this provision expressly going forward and they fail. And all there is is an effort by some people to essentially hobble the Secretary of Health and Human Services in her ability to discharge what have to be understood as obligations of the United States, then under those circumstances, the right result is to file a suit and get your judgment and then get your claim from the judgment fund. But it is not the law that the government can simply make its obligations go away by deciding that after the fact, after the obligations have been incurred, after the counterparty has been performed, we're just not going to appropriate the money. Breyer. Why isn't this a contract? I think it very much operates like a contract, Justice Breyer. Yeah, but why isn't it one? Well, we're saying it is. And I think the – I think the – Are you some authority that says this isn't a contract? No, I don't, Justice Breyer. Look, I actually think the best two paragraphs on this issue is what Justice Scalia said in his Bowen opinion, because what he said is you could understand this kind of statutory offer either as a unilateral offer to contract that's accepted through performance, or you could understand it as a statutory obligation. And he said, consistent with the position of the Federal Government in the Bowen brief, which is worth a read if you get a chance, but he said, consistent with their position, the better way to think about it is that it's a statute, and it's a statutory obligation that could be enforced. Mr. Clement, the problem was that Justice Scalia was in dissent. So how do we – how do we salvage his observations when it didn't win the day in that case? Well, it's easy to, Justice Sotomayor, because the majority did not actually disagree with him on this point. What the majority held was that the exclusion in the APA was not necessarily coextensive with the Tucker Act jurisdiction. So it thought the claims there could be brought under the APA. But it even said in footnote 48 that even if some of the claims could be brought under the Tucker Act, that would be fine. You could bring those claims in the – in the court of claims, but it wouldn't mean that there was a bar on APA jurisdiction. So I think – So give me a one or two sentence distinguishing of that case from this one. Why is this one mandate – mandating Tucker Act payment and that one wasn't? Because they both had the shall pay language. Yeah. So, Justice Sotomayor, I – And both statutes have it. Right. So I want to repeat my point that I don't think anything in the majority or the dissenting opinion there said that that wasn't many mandating language that could have been brought in the court of claims for at least retrospective relief. I'm quite confident of that. But there's also a distinction, which is what the court relied on there was the ongoing relationship between the states and the federal government there and the fact that the way that the program worked there, what the state was actually suing for is not having to – was in order to not have to reimburse some funds. I think if you actually think about that opinion and read the key footnotes, which are 31, 38, 42, and 48 – I think I have that right – if you look at that, I don't think there's any indication that if what was at issue there is something like this, which is an entirely retrospective set of obligations for a program that essentially sunsetted in 2016. I don't think there's any indication that the court would have thought that should be brought as an APA action and not as a Tucker Act claim. And of course, keep in mind, the government's position is not that we sued in the wrong court. The government's position is that there's just not sufficient money mandating language in this statute. And I think that's a very difficult proposition to sustain if you take seriously not just 100 years of court of claims and Federal Circuit cases, but also compare it to White Mountain Apache, compare it to – compare it to the Mitchell case from 1983. This is much more obviously money mandating language. And again, it was in a brief, and it was in a brief where they persuaded Justice Scalia, but not every member of the Court. But the government in its Bowen brief essentially said that they couldn't imagine clearer money mandating language than the shall pay language in that statute. And here, it's even clearer. It's all retrospective, and it's a shall pay obligation to specified individuals for specified sums under specified circumstance. And then one other distinction, like more than two sentences at this point, but one other distinction is unlike another – any other statute I've seen, you have the parallel language in what was expected of the counterparty, the same shall pay language. And even the government says that, of course, that was just an absolutely mandatory obligation. If you put this all together, what the government's position is, it's really extraordinary, because they – their position is there never was any binding obligation at all. They didn't even have to appropriate the payments in. That just happened that later Congresses did that through the user fee appropriation. So their view is that a promise that was conceitedly designed to give comfort to the insurance companies, that they would have some coverage against losses, actually provided no coverage against losses, but absolutely mandated the payments in no matter what. And I do want to emphasize that no matter, like, how you look at their position, it is completely inconsistent with all of this Court's cases, even the ones that go in their favor. And one way to look at that is, under their view, there was nothing to repeal. But the other way to look at that is if you look at cases like Langston, like Dickerson, like Will, in the original statute that provided for a salary or provided for a payment, none of those original statutes had language that talked specifically about budget authority. So under their view, those cases were really easy cases, and this Court completely missed the ball and misanalyzed those cases. Kagan. Is it possible to think of those cases as cases we shouldn't rely on to the extent we usually do because of the judgment fund? In other words, we live in a different world now? No, absolutely not, Justice Kagan, because what happened in those cases is even before the judgment fund, there were judgments. And there was a judgment in that case for, I think, $7,666 against the Federal Government. Now, under their theory of the case, there should have been no judgment. That judgment should have been affirmed. And back then, of course, once you got the judgment, you went to Congress and tried to get Congress to pay it. And of course, Congress generally almost always paid it, so you never had to answer the $64,000 question of whether there was a taking if they just refused to pay it. I think another reason to decide this case in our favor is if you adopted the government's position, you'd have to overcome not just the presumption against implied repeals, but also the presumption against retroactivity. And none of the cases that the government can point to ever held the private party essentially was on the hook, and the government didn't have to pay once the obligation was already incurred. The cases like Dickerson and Will, they were talking about prospective obligations for the next year. When this Court has confronted cases where the government was saying that it didn't have to pay for past obligations, cases like the 20 percent cases and the Larianoff case that are cited in the reply brief of Land of Lincoln, the government never won those cases. And the reason there's a big difference is when the government says, we're not going to pay, and they're talking about only a prospective obligation, maybe it's fair to infer that they want that prospective obligation to go away. But if they're to say, we don't want to pay for something that's an obligation they already incurred, then they're actually risking, I think, a very serious takings violation. Again, Justice Breyer for the Court noted that there was a potential constitutional problem with retroactive legislation of this type in the Cherokee Nation case. So it's always been recognized that there's a big difference in this context between retrospective obligations and prospective obligations. So there's really no precedent on the government side of this case, and it would be a terrible precedent to start, because this is not going to be the only context where it's very important for the government and Congress to be able to make enforceable promises to pay. Alitoson Has there ever been a case where this Court has, in effect, required Congress to appropriate, through the judgment fund or in any other way, billions of dollars for private businesses? Well, look, I don't – I mean, it's a contract case, but if you cut right down to it and you adjust for inflation, I would think Winstar got you into the billions of dollars as well. And I think Winstar is another good example, although it was conceived of as a contracting case. The government came in after the fact and tried to tell this Court that its original promises to make good on the goodwill were just illusory, and they just – you know, they just didn't bind future Congresses. And this Court didn't buy the argument then. It shouldn't buy the argument now. I totally get the point that Congress has the power of the purse, but Congress is not disabled from making an enforceable promise to open the purse in the future on specified terms. Thank you, counsel. Mr. Kneedler. Mr. Chief Justice, and may it please the Court. As the Chief Justice has said, the Appropriations Clause of the Constitution is central to this case. This Court has described it as a straightforward and explicit command in OPM v. Richmond. That command is a central feature of the separation of powers under the Constitution, and it's reinforced by the requirement that appropriations bills originate in the people would have and would jealously guard the power of the purse. And that system – constitutional framework is reinforced by the Anti-Deficiency Act. That is all part of the framework under which 1342 operates. 1342 did not make an appropriation. Therefore, the Secretary could not make a payment. Any payment was contingent upon a future appropriation. As soon as Congress passed the first Appropriations Act after this, it passed an appropriation, not a rider, which is usually something tangential. It is the very Appropriations Act. And the only thing they appropriated was payments in, the user fees. They prohibited, as Justice Alito pointed out, the only other possible source of funds. The Secretary's compliance with that constitutional and statutory framework does not constitute a violation for which a cause of action can be inferred under the Tucker Act. Despite all of that, petitioners do rely on 1342 in the absence of an appropriation as an obligation to pay. And that would impose unprecedented liability on the United States of billions of dollars. Nothing in Section 1342 requires that extraordinary result. It's particularly telling that 1342, Congress said it should be based upon the Part D risk corridors provision. The Part D risk corridors provision contains express language that it states an obligation of the Secretary to pay for Medicare Part D drugs, and it represents budget authority. None of that is in 1342, which is patterned after it. Day one of contracts. Jack Dawson, I say to you, my hat's on the flagpole. If you bring it down, I'll pay you $10. You bring it down, I owe you $10. Now, how does this differ? And if it didn't differ, so why does the government not have to pay its contracts just like anybody else? And that's, is there some language? I guess they could pass a statute and say, we won't pay our contract. Okay? And you have to follow the statute, unless the Court sets it aside. They didn't say that. They didn't say they didn't. I mean, you know, you've read the argument. They didn't say they wouldn't pay. They just said, don't pay it out of this fund. That's common. What it means is, don't pay it out of this fund. End of the case. If you have some other fund, pay it out of that. It doesn't say don't pay it out of that. So that's very simple-minded, what I've just said. But what's the answer to it? The answer is that this is not a contract. Why not? This Court — Well, I mean, it's pretty close, but why isn't it close? Why isn't it either a contract or close enough? It says, shall pay. If you climb the pole, we'll pay. They climb the pole, pay. It's very far from a contract. And I think the starting premise is what this Court has repeatedly said and reiterated in the national — the Amtrak case, the National Railroad Passenger case, which is statutes are generally, absent a clear statement, construed not to establish a contract, not to establish private contractual rights or vested rights, because a statute states a policy of the legislature until the legislature changes that policy. There is nothing in this statute that creates an express contract. There's no language — So is every congressional promise to pay therefore subject to an implicit subject-to-appropriations caveat? I believe, by and large, that that is correct, yes. How did we decide Windstar? I remember staying here until July. And somebody over in the government had promised all those banks that if they did da-da-da, they'd get paid about a billion dollars. And they did do-do-da. And those promises were based on contracts. A contract is very different from a statute. This is a general statute providing — it's one of many subsidies under the Affordable Care Act for people who participate in a private market. The insurers were not performing services for the government. They weren't working for the government. They weren't furnishing goods to the government. They were participating in a private market. All the things — all the statutes that say — I don't know. Most things to me, there must be a lot. And I haven't looked it up. I have seen a lot of cases they cited. But all the statutes that say if you do X, the government shall pay you, Mr. Veteran, Mr. Paratrooper, Mr. — you know, you name it. They don't really mean it. Is that — is that what it is? No. It's not a contract? I mean, I don't know how this works. It is definitely not a contract. Someone who works for the government does not work by contract. Government people are appointed. And I think it's important, the Langston case and that line of cases have been mentioned here. First of all, Langston is the only case in which this Court found liability. And seven years later in the Belknap case, the Court said that's as far as we're going to go. And in Langston, what was critical is the Court found the appropriations language ambiguous. Congress had appropriated, had paid the amount that was called for in the salary statute before, and the Court couldn't believe that Congress really meant to cut that back. Here, there's no question. The Appropriations Act is unambiguous. It specifically refers to 1342 and tells you what money can be paid. It didn't repeal the child pay. In fact, there were bills to repeal, and there weren't sufficient votes in Congress to repeal. So whatever they did, it didn't repeal the obligation, the risk-card obligation. It stayed there, and an appropriation is a temporary legislation. It controls the appropriations in a particular fiscal year. But isn't the fact that they didn't have the votes, they couldn't repeal this measure, significant? No, I don't think there's any indication they didn't have the votes. All the bills that were cited here were simply bills that were introduced. The idea that Congress rejected them just because they were introduced is not correct. There were two types of bills, one of which was to repeal it outright. Congress, nobody says the appropriations law here repealed it. The other was to make payments in, match payments out, so that it would be budget neutral. That's exactly what the appropriations statute did. Roberts. I vaguely recall the government arguing on several occasions that unenacted bills are entitled to some weight in the interpretation process. But you don't question that these insurance companies would not have participated in the risk corridor program but for the government's promise to pay. I don't. Well, it's not about participating in the risk corridor program. The question is they participated in the marketplaces that were set up, the exchanges, and they had a number of business incentives. This was a vast new market for customers, many of whom, 90 percent of whom would get tax subsidies. Customers who otherwise were largely uninsurable. Yes, but it was a market. Well, that's no great business opportunity for them. Oh, no, it is because Congress provided tax credits to subsidize the persons who purchased insurance on the exchanges. No, it's a good business opportunity for them because the government promised to pay. Well, it's a good opportunity for the insurance companies. There were a number of incentives here. There were two other risk-mitigating provisions in the Act. Are you saying that the insurance companies would have done the same thing with or without this promise to pay? I don't think we know what they – I don't think that they would have declined to participate. They may have charged greater premiums, but that's different from not participating. Okay. But that's a materially different thing. Well, it – I mean, the government – the Congress that passed this provision wanted to keep the premiums down, didn't it? And so it induced a certain kind of reliance on the part of the insurers. It wanted to encourage – I think the primary point was to encourage the insurers to go on the marketplace. And as I say, they had a bunch – there were a number of subsidies, both of the individuals through the tax credits and the insurance companies through the risk mitigation provisions. But – and Congress provided in the private sector – again, the insurance companies were not performing services for the government. They were taking advantage of an opportunity in the private sector that Congress had – that Congress had established with a bunch of subsidies. This is just – this is just one of them. They were induced to charge lower premiums by the shall pay language. I think we can assume that that contributed to it, but it was a subsidy. And there's something I want to say. When we were talking about the Langston case, it very much differs from this context. Langston and that entire line of cases were cases about, as I think I mentioned, employment, salary. There was – in a salary situation, while it's not a contract, there is an exchange of services for money. And I think— Breyer— That's exactly my question. You seem to have two separate arguments. One depends on the – on the appropriations – on the appropriations measure. Suppose there were none. No appropriations. No, there had never been any appropriations language. That didn't exist. I think you want to argue, even so, the government wouldn't have had to pay. That's correct. All right. Now, on that, I don't think you're saying – look through the statute books. Every time the statute says to any private citizen, if you do X, we shall pay you. Okay? That's the form. And it may exist all over the place. And you're saying at least sometimes they don't have to do it. Or maybe you're saying they never have to do it. What are you saying? Well, you would have to look at the particular statute. No, no, no. That's what I wanted. Then you're saying sometimes. No, I think – I think almost never, but— Almost never. Okay. What is the line that distinguishes those instances where the government says, we shall pay you, Mr. Private Citizen, if you do X? He does X, but the government does not have to pay him. What is the line? Okay. When Congress wants to undertake that sort of obligation, it does it through contracts. It does it by authorizing an agency to enter into contracts, which then forms a bilateral promise and performance back to the government. No. You're saying if there isn't a contract, never. Very well. What is the case that supports that line that says, unless government, you delegate to a private and delegate to an official, the power to enter into a contract with the private citizen, unless you do that, even though you said shall pay, you don't have to? Okay. What is the case that says that? Well, I don't have a case of this Court that says it, but, frankly, neither does the other side in a subsidy program like this. All of the cases – again, I want to come back to this. All of the cases in the Langston line of cases, all the way up to Will, were about salaries, and there is, I think, a sense, and it's now, for example, in the Civil Service Code, a government employee is entitled to a salary. We all understand that. In fact, in Langston, the background statute said that the person was entitled to the salary. There is no language like that. I'm just not sure why that makes a real difference from this case. I mean, those cases were about a certain kind of compensation for services rendered. And this case is about a certain kind of compensation for services rendered, isn't it? No, it's not. This is a – this is what's different. This is about subsidies for people participating in the market. They are not services rendered to the government. There is no promise by the government individualized. It was services that the government thought were needed to ensure the working of the program that it wanted to carry out. Well, Congress frequently enacts subsidy programs. And, yes, it does it with the hopes that people will carry out, you know, the incentivized program. But that doesn't mean Congress has made – has created a vested right in them. Again, I want to come back to the Amtrak case and referring back to the Dodge case as the canonical statement. And that is that an act – that a statute, an act of Congress, absent clear indications, is not construed to create a contract and is not construed to create vested rights. It establishes a policy which the legislature is – Absent clear – what clear indication would be required short of a contract? We had an – we have an example. I mean, tellingly, in this case, we have an example in the Part D Medicare risk carders provision in which Congress in 1342 for this risk carder program said base this one upon that one. That one, though, has the express advance budget authority and expressly says this represents an obligation of the secretary to pay. Mr. Clement – I'm sorry. Mr. Clement says that there are also many provisions that say, in essence, shall pay subject to appropriations. Well, the – In other words, Congress knows how to prevent the obligation from being – from taking effect before the future appropriation, and in fact does so often and did so in the Affordable Care Act. Well, in the Affordable Care Act, I think it's – I just want to point out to the Court, they cite a handful of provisions in the Affordable Care Act, and they're almost all in specialized grant programs, but it's telling. If you look at them, they're ones that are immediately adjacent to them, which have parallel grant provisions and don't have this language. 42 U.S.C. 480K has this language. The two immediately preceding it, 280J3 and 280K1, also grant programs and don't have it. And the same thing is true with 293K2E, which they cite. The two immediately preceding don't have that language. There is no rhyme or reason in the – in the Act for that. It's not entirely clear what the subject to appropriations language does. We frankly look to see if there's an appropriations or statutory principle. We were unable to find one. I think it may be – Well, I think it's pretty clear what the subject to appropriations language does. It puts people on notice. It says this is not a guarantee. It says, you know, you should take this with a grain of salt. And when it's not there, the government says, we're committed. I think that would be a great over-reading of those provisions, which I think may be present just as a matter of habit in particular committees. I think they are housekeeping within the government. You have an authorizing committee that sets up the program, but an appropriations committee that comes along later. But I don't think the presence or absence of this – the appropriations clause and the Anti-Deficiency Act state this very rule. And Congress is entitled to rely upon that and not expect that an inferred cause of action would be inferred. I've never understood the Anti-Deficiency Act to apply to the actions of agencies. I understood it to apply to individuals who go and obligate the government when they really had no authority to do that. I never understood it to mean whenever the particular agency or department pays money that they're going to be prosecuted under that criminal provision. Right? The agency wouldn't, but the criminal statute is the way in which Congress has enforced it. Okay. So the Secretary of the Treasury is going to be prosecuted criminally because of his interpretation of whether or not the funds were authorized. Well, I mean, if it's a reasonable interpretation, he's probably not going to be prosecuted. But that is the way in which Congress has kept the power of the purse. One of the pieces of the Anti-Deficiency Act has to do with Congress's own ability to commit itself. The Anti-Deficiency Act, this is a statute that speaks that 1342, as most shall pay statutes would, speaks to an agency. But when 1342 says pay, first of all, it says the Secretary should set up a program under which the Secretary would pay. It's really a feature of a described program, not a direct statutory command. But even so, putting that to one side, it speaks to the Secretary. The Anti-Deficiency Act speaks to the Secretary. It tells the Secretary, I know we've said that you shall pay this, but it's contingent upon the subsequent appropriation. And here, when Congress subsequently appropriated, it limited the amount of funds that were available. And in deciding whether there's an inferred cause of action, you should look at the appropriations language and the Anti-Deficiency Act. I'm thinking about your answer, and it's interesting. But let's take a form of words. I'm back in that simple thing. If you do X, we shall pay Y. Now, where we left off was if that form of words appears in a statute, Congress doesn't have to do it. But if the statute says a GS-12 can use those form of words, write them down, hand them to the other side, then they have to do it. Okay? Because that's a contract. That's where I think we were. And there's no authority either way. All right. If there's no good authority either way, to use a word that's not always appreciated in this Court as much as I do, what policy could that rule serve? What policy, constitutional or otherwise, would be served by a rule that says a GS-12 can make the United States pay the money, but the Congress of the United States, House and Senate, signed by the President, cannot? Or does not? Does not? I think fundamental policies. What? First on the contract side. A contract is a document that is bilateral. It is signed by each party. There are reciprocal undertakings specific to that individual. And in that situation where you have an appropriation, and Rama was a contract case, not a statutory case. And what the Court said there, when you enter into a contract, you're entitled to be paid because the individual contractor who has performed services to the government and expects something in return, can't be expected to keep track of the appropriations account and can't be responsible if the agency devotes funds to other purposes. A statute is fundamentally different. It is not an individual bilateral relationship in which the government says we will make a commitment to you if you do something. And the fundamental point on the statutory side, I go back to the Amtrak National Passenger Railroad case, in which the Court said that a statute, absent a clear statement, is construed not to impose a contract or vested rights. And that is in deference to Congress. And in this context, it's tied back to the appropriations clause. If we were to rule for you, everyone will be on notice going forward, private appropriations obligate actual payments. If we rule against you, Congress also will be on notice going forward that it needs to include subject to appropriations kind of language in any mandatory statute. My question is, if we rule against you, are there other existing statutory problems lurking out there in the interim? Well, one of the problems is we don't know what may be out there. There are other shell pay situations. But again, there's usually not in this type of program, which is a generalized subsidy for people participating out there. When Congress wants to commit itself to making payments to private people, it usually does it through specific instruments, through contracts and through grants. And that is the way Congress does it. And I think, in other words, you keep saying a generalized subsidy. Is that just a repeat of your argument? In other words, no money-mandating language can be considered to create an obligation on the part of the government because you would call that, without an appropriations provision, simply a subsidy? Well, I'm trying to draw a distinction between the situation where there might be a bilateral relationship either in contract or in all of the cases. Well, I know. And I'm trying to push you to see where the limits of your argument are. Without regard to any type of appropriations language, there is no situation when the government makes a promise to an entity to engage in activity to climb the flagpole in Justice Breyer's hypothetical. There's no way that that would be regarded as money-mandating if there weren't appropriations language. I think that would be the general rule. But let me point out here, there is no language of promise in this statute. There's no language of entitlement on the part of the insurance companies. You shall pay, right? Well, it's an instruction to an agency to pay. But when you have an instruction to an agency to do anything, it is always conditioned upon your ability. Well, I guess we would have thought it's not so much even that the agency will keep its promise, but that the agency will keep its promise to the government. I mean, right? I mean, just because the government told the agency to pay, that doesn't mean the agency has to. No. No. Well, the agency can't under the Constitution because an appropriation is not available. And there's one other piece of it. I'm sorry. Let me stop there just a moment. Following your analogy, and I do understand it, you're saying it's not a contract with the recipients because this is an order to the Secretary. Yes. And the Secretary says, devise a program, pay out this amount to the participants who suffer a shortfall, and it says that's the program you have to set up. So that's the program that they set up in 2014. They give assurances that the government has promised to pay. And in 2015, they say the appropriations bill limits how I can pay you, but it doesn't rescind and it doesn't tell me not that you won't be paid. They say that over and over again, 2014 at the end of it, 2015, 2016. The GAO manual, which is the Bible for Congress, says what you tell the Secretary to do, he will do. So why isn't this an enforceable contract where the government is bound? The agency acted consistent to the legislation and to the directives of Congress. He didn't offer the money because he couldn't, but he did exactly what this bill told him to do. And that's why the compliance with the Constitution and compliance with the statutory framework is not a violation of law that gives rise to an implied damage remedy in the Court of Claims. And one other piece of this. But you can't say to me that Congress is not empowered to empower the Secretary to act. Congress can tell the Secretary to enter a contract, can't it? Yes, but on that score, if I could just point out 31 U.S.C. 1302D, Congress in implementing its control over appropriations has itself adopted a rule of construction. And under that statute, it says that a law shall not be construed to make an appropriation or to authorize contracts in advance unless it specifically states so. That is a clear and a fortiori. Mr. Kneedler, are insurers obligated to pay in if they have excess profits? Yes, it is a user fee. So this is one where the shall pay in is obligatory, but the shall pay out on the part of the government is not obligatory? The pay in is not subject to a – is not an appropriations question. It's an obligation. And that part of the arrangement, the reciprocity in the program still exists, payments in and payments out, which is how I think most – You pay in, that's obligatory. We commit ourselves to paying out, it turns out, if we feel like it. What kind of a statute is that? I don't think that's a fair characterization because just like any program where Congress directs the secretary of whatever department to establish a program, the secretary can't go forward with that without appropriations. That includes a subsidy program. That includes a regulatory program, all manner of programs. And that's what happened here. It would be a dramatic change for this Court to say that when Congress says that an agency shall establish a program and pay out money under that, that if Congress declines to appropriate the money for it, that gives rise to an implied cause of action in the – under the Tucker Act. We have three reasons why that shouldn't be so. Justice Ginsburg's point that against implied causes of action, the Amtrak case that says an act of Congress is not to be construed to create contractual or vested rights in private persons, and the Appropriations Clause and its implementation in 1302D that says, absent a clear statement, an act shall not be read to be an appropriation or to provide contract authority, the result the petitioners seek here is essentially to make 1342 an appropriation as the source of money to be paid out under the judgment fund. But the judgment fund is available only if there's a violation, and there's no violation to begin with. But even if – even if you thought that there was a commitment, a binding commitment of some sort, the Appropriations Act here, Congress clearly intended not to – not to provide for payment. So I think a respect for the way in which appropriations have been understood, and Congress's power over appropriations have been understood for hundreds of years, it's important for this Court to not impose monetary – implied monetary liability under the – under the Tucker Act, and to extend Langston from its very modest context of a salary to which the statute said he was entitled, language that is not present here, to impose liability on the government in billions of dollars, not $7,500. It's a modest context, but isn't it the same principle? I don't think it is the same principle, because the – And the distinction is the salary? The salary of someone who is working for the government, and one – the statute said he was entitled to it. Again, we don't have that here. But even without that language, I think one would – one would think of someone working for the government. He's delivering services to the government. The pay that is owed him is – is in reciprocity for that. That's far different from a subsidy program in which – in which Congress, without a contract, without a bilateral relationship, without an individualized promise, has made money available under a generalized subsidy program. That's – that is a huge, huge difference. And all the cases in Justice Scalia's opinion, dissenting opinion, in Bowen v. Massachusetts are employment cases. And he's saying, yes, you can go to the Tucker Act on employment cases. But that's vastly different from the statutory arrangement we have here. Thank you, Mr. Kneedler. Five minutes. Mr. Clement. Thank you, Mr. Chief Justice, and may it please the Court. I'd like to just start off with Justice Kagan's point that the government takes the payment in obligation with the exact same language to be absolutely mandatory. And I assure you, if one of my clients, when presented with the bill, said, well, we have a bunch of internal rules at our company, and I actually can't disperse the funds until I get approval from the Treasury division at our company, I don't think the government would be impressed by that, and they certainly wouldn't say that the mandatory obligation just somehow disappeared because the rule said we didn't have the funds to pay it at that particular moment. I'd also like to talk about the subject to appropriations language, because that's not just a feature of many other provisions of the Affordable Care Act. I asked one of my associates to look at how many times that appears in the U.S. Code. When he gave me 200, I told him he could stop. This is a recurring provision in the U.S. Code, and they would wipe out 200 references to subject appropriations. They would mean absolutely nothing. Text matters here. Obviously, they don't want to talk about the text of the appropriations riders, because the text doesn't have language that says repeal. It doesn't limit payments out to payments in. It doesn't even have the this or any other act language that was at issue in Will or Dickerson. And to be clear, that's not because Congress forgot how to use that phrase. The same 2015 Appropriations Act had multiple provisions that failed to appropriate funds and said no funds available under this or any other act. There were also provisions in that same 2015 Appropriations Bill that expressly repealed substantive provisions. So Congress knows how to repeal. It knows how to emphatically limit funds. It didn't do that here. Another point that I want to make clear here is just my friend has used the term subsidy a lot in describing this program. This really doesn't feel like a subsidy, because nobody, none of my clients get paid a penny unless they suffer actual losses. So this is not a great subsidy program if the only way you can get paid a penny is if you lose lots of money by losing money by providing your products on the exchanges. So what I would describe this program as is essentially more like an insurance program. The government says we very much want you to do this, and if you do it and lose money in the process, we shall pay a percentage of your losses. That's why this retroactivity here is so pernicious, because what could be worse than getting an insurance policy, and at the point that you actually suffer a loss and try to make a claim, they say, oh, I'm sorry, we just decided we weren't going to fund that policy, even though you performed, even though you suffered actual losses. So I really wouldn't describe this as a subsidy program. My friend on the other side suggested that there's no case law one way or another on this. I just respectfully disagree. I think White Mountain Apache, I think Mitchell, the 1983 Mitchell decision, sometimes referred to as Mitchell II, are cases where this Court said there was money mandating directly from a statute. And those were Indian trust cases where the direction was much less specific than this. You shall administer this property in a trust. And the Court found an action there. There you really had to do some inferring and some implying to get to the cause of action. Not so with respect to this kind of direct shall pay obligation. My friend also relied a lot on the Amtrak case. I think it's worth taking a closer look at that case, because the kind of contracted issue there was the kind of contract that would essentially bind the Federal Government in perpetuity and prevent them even from taking action prospectively. So there it was basically about whether the employees of the railroads that got consolidated into Amtrak were going to get essentially a free pass for life. And the Court in that context said, well, we don't want to bind future Congresses forever on that. But this is different. This is whether you're going to be bound to a contract where the counterparty has already performed to their detriment. And in those circumstances, I don't think there should be any special rule. Again, I think the two paragraphs in the Bowen dissent are exactly right. I think this is a unilateral contract that's accepted through performance, and then the government has to pay. But if for some reason you think you don't get a contract unless the statute says  that all those cases that Justice Scalia relied on are salary cases, it's not actually true. There are also pension benefit cases there for pensions that are available or special benefits that are available to law enforcement officers and firefighters. So this is not some principle that's been limited strictly to the context of salary provisions. And my final point is on what Congress was trying to accomplish here. There is no question that they wanted to get the insurance companies to provide these policies. But there is equally no question that they wanted the premiums to be relatively low. And in thinking about the billions of dollars that this failure to uphold their obligations is going to cost the government, you shouldn't lose sight of the fact that they also saved billions of dollars in tax subsidies by reducing the premiums through this commitment. Thank you. Thank you, counsel. The case is submitted.